743 So.2d 936 (1999)
Judith BARNES and Bobby Ray Barnes, Plaintiff-Appellees,
v.
Jeremiah REED, All State Insurance Company, T.J. Martin, Jr. and Financial Indemnity Company, Defendants-Appellants.
No. 32,380-CA.
Court of Appeal of Louisiana, Second Circuit.
October 29, 1999.
*938 Street & Street by C. Daniel Street, Monroe, Counsel for Appellants.
Hudson, Potts & Bernstein by Mark J. Neal, Monroe, Counsel for Appellees.
Before WILLIAMS, STEWART and DREW, JJ.
DREW, J.
Defendants Jeremiah Reed and Allstate Insurance Company appeal from a judgment which awarded plaintiff, Judith Barnes, general and special damages for her injuries sustained in an auto accident. In addition to urging the damages were excessive, Reed and Allstate complain that the trial court erred in finding Reed totally at fault in causing the collision, in failing to apply the sudden emergency doctrine and in refusing to allocate a portion of the fault to another motorist. For the following reasons, the judgment is amended and affirmed.

PROCEDURAL HISTORY
Plaintiffs Judith Barnes and Bobby Ray Barnes filed suit against Reed, his insurer, Allstate, T.J. Martin, Jr., and his insurer, Financial Indemnity Company. On March 24, 1998, on motion of plaintiffs and defendants Martin and Financial, the court dismissed the suit against Martin and Financial owing to a settlement. The case proceeded to trial against Reed and Allstate. At trial, the plaintiffs' attorney waived Bobby Ray Barnes claim for loss of consortium, leaving only Mrs. Barnes as a plaintiff. Judgment in favor of plaintiff was signed on November 20, 1998, and defendants subsequently brought this suspensive appeal.

FACTS
This accident occurred on Christmas eve, 1996, on Washington Street in Monroe, Louisiana. Washington Street is a four-lane, east-west thoroughfare divided in the center by a grassy median strip which is broken at irregular intervals with paved sections connecting the east and westbound lanes. T.J. Martin, a resident of Gilbert, Louisiana, visited a business (Greene Welding) on the north side of Washington Street. Finding the business was closed, Martin left to return home. Unfamiliar with Monroe streets, Martin failed to notice that Washington was a divided road and pulled his pickup truck into the westbound lanes and proceeded east. Martin drove east in the westbound lane closest to the median which appeared to him to be the right lane. Martin said that he had driven what could have been 100 yards but not more than 200 *939 yards before realizing that he was going the wrong way. He looked ahead and saw a pickup truck he estimated to be about 500 yards away coming toward him in his lane. Martin stopped his truck, put it in reverse and looked in his rear view mirror as he backed up to a crossover near the closed store, where he pulled into the eastbound lanes and proceeded eastbound away from the scene. He did not recall a bridge on the roadway and did not see a collision between Mrs. Barnes and Reed. Martin stated there was no near accident between his vehicle and the oncoming truck. Further, Martin did not ever see either the Barnes or Reed vehicle. When contacted by the police officer, Martin acknowledged he had driven the wrong way on Washington Street but was unaware an accident had occurred. The officer issued Martin a ticket, which he paid without contest.
At around the same time, Jeremiah Reed and Judith Barnes were driving their automobiles westbound on Washington street approaching the closed store. At this point, Washington Street completes a curve to the right just before a bridge over a culvert; the curve is sharp enough to limit a driver's ability to view the road ahead. The bridge has small metal guardrails on either side. Reed, whose wife accompanied him, was driving an Oldsmobile sedan in the inside, or left, lane, while Mrs. Barnes was driving alone in a Toyota sedan in the outside, or right, lane. The Reed vehicle was slightly ahead of the Barnes vehicle.
Reed said that as he completed the curve to the right, his wife said "Don't hit that truck now." Mr. Reed had not seen a truck until his wife called his attention to it. At trial Reed could not remember how far away the truck was from his car. At an earlier deposition he estimated it might have been as close as "five or six yards" away, but Reed testified the ongoing vehicle could not have been that close or he probably would have hit it. Reed said that the oncoming truck was not that close because he "wrestled a long time" trying to avoid Mrs. Barnes' vehicle and the truck. He also estimated the time from when he saw the truck until impact with the Barnes vehicle as five to six seconds. As the Reed and Barnes cars reached the bridge, Mr. Reed pulled his car to the right in an effort to avoid a head-on collision with this truck and, in doing so, ran into Mrs. Barnes' car. He said that Mrs. Barnes pulled over, that he pulled in front of her, and that the wrong-way pickup truck drove past them continuing to go the wrong way down Washington.
Mrs. Barnes said that she never saw the wrong-way truck and that she believes that she would have seen the truck had it been there. She said that as she drove onto the bridge, Reed pulled into her lane, hit her, and then stopped in front of her.
There was some testimony about statements allegedly made by another motorist, Irma Byrd, traveling behind Barnes and Reed. Mrs. Barnes, in response to questions from defense counsel, testified:
Q: And afterwards you spoke to Mr. Reed, is that correct?
A: Yes, sir.
Q: And he told you that a vehicle was in his lane of travel coming head on and that he swerved in order to avoid a head on collision, is that correct?
A: I don't believe he toldI believe the woman that was behind me told me.
Q: Okay. Somebody in your lane of travel saw what occurred and told you about that?
A: Right.
Q: Was that Irma Byrd?
A: Yes, sir.
Monroe Police Department Officer Eugene Lumpkins made the report of the accident. Defendant attempted, through the officer, to introduce into evidence other statements allegedly made by Ms. Byrd. Sustaining a hearsay objection, the trial court properly refused to consider these statements, but allowed defendant to proffer *940 the officer's testimony that Ms. Byrd told him that she saw Martin's pickup truck going the wrong way and that Martin caused Reed to run into Mrs. Barnes. Byrd evidently wrote down Martin's license number; this information apparently led to the discovery of Martin's identity as the wrong-way driver and further led Officer Lumpkins to ticket Martin for driving the wrong way.
The officer testified that when he arrived at the scene of the accident, the Reed and Barnes vehicles were partly in the right lane of traffic and were still touching. The officer found no skid marks and estimated the point of collision was approximately 100 yards from the street where Mr. Martin entered Washington street going the wrong way. He confirmed that there would have been enough room on the road for a truck going the wrong way to pass by the accident in the left lane once the vehicles involved had stopped in the right lane.
Mrs. Barnes put on evidence of her injuries and the treatment thereof. She said that the impact jarred her, but that she did not feel that she was injured until later that night. She began to have pain in her lower back and in her legs, and on January 8, 1997, she saw an orthopedist, Dr. Etheridge, who gave her muscle relaxers and recommended physical therapy. Mrs. Barnes began physical therapy, but the therapy failed to improve her back and leg pain. On January 23, after therapy, her pain became so bad that Mrs. Barnes sought relief at the Glenwood Regional Medical Center Emergency Department. The doctor who treated her there gave her a shot for the pain, recommended that she stop the physical therapy and referred her to the Orthopedic Clinic.
On March 4, Mrs. Barnes had an MRI on the recommendation of another orthopedist, Dr. Douglas Brown. Dr. Brown also recommended electronic "tinge" therapy, which Mrs. Barnes underwent but which did not resolve her pain. On April 29, Mrs. Barnes had a myelogram at the hospital. As the physician administered the dye, Mrs. Barnes lost the feeling in both of her legs. Although the feeling returned to her legs by the next day, the effect frightened her and required that she stay in the hospital overnight.
Mrs. Barnes reported at trial on August 3, 1998, that she still had some back pain, particularly when she sits for long periods, and also at night when she must often take pain medication in order to sleep. She said that she had no back trouble until this accident, and that the pain has reduced her ability to do certain tasks, such as housework, for long periods. She further said that the pain has reduced her ability to carry heavy items required in her business pursuits, the sale of home interior products. Mrs. Barnes finally said that the incident had caused her to miss work only when she had therapy appointments.

DISCUSSION

1. Allocation of Fault / Sudden Emergency
A district court's findings of fact will not be disturbed on appeal unless the reviewing court finds that they are clearly wrong or manifestly erroneous. Stobart v. State, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). Under the manifest error standard, the linchpin is whether the trial court's findings are reasonable; even if the appellate court feels its own evaluation of the evidence is more reasonable, the trial court's findings cannot be reversed if they are in fact reasonable. Lewis v. State, 94-2370 (La.4/21/95), 654 So.2d 311. In other words, the appellate court may not reverse simply because it is convinced that had it been sitting as a trier of fact it would have ruled differently. Lewis v. State, supra. A finding of fact by a trial court should be upheld unless it is clearly wrong. The manifest error rule also regulates allocations of fault. Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607.
*941 In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985), the supreme court explained that, to determine the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff and considerations in determining the relative fault of the parties.
A plaintiffs settlement with a solidary obligor reduces his recovery against the nonsettling tort-feasor by the percentage of fault of the released solidary obligor, but only where the remaining defendant proves at trial that the released party was a joint tort-feasor, and therefore solidarily liable. Taylor v. USF & G, 630 So.2d 237 (La.1993).
The testimony of the parties to this accident differed greatly. Mrs. Barnes made it clear that she would have seen an oncoming truck had one been approaching, and she did not see a truck. Martin said nothing about seeing the west-bound two sedans. When he saw a truck in the distance, he stopped his vehicle, backed up and moved to the proper eastbound lane. Although he estimated the approaching vehicle to be about 500 yards away, that estimate may be imprecise in light of the photographic evidence which also casts doubts on the distance estimates Martin gave of how far he drove the wrong way. The police officer stated that the distance from the side street from which Martin pulled onto Washington and drove in the wrong direction was 100 yards from the point of impact near the small bridge.
We further find no error in the court's decision not to credit Mr. Reed's testimony about the accident. Mr. Reed, 83 years old at the time of trial, admitted that he had a tendency to be forgetful, and even from the cold record his testimony frequently appears disjointed and often confused.
As for the evidence regarding the alleged statements of Irma Byrd, plaintiff cites the familiar rule that a finder of fact is entitled to draw a negative presumption from the failure of the defendant to call this person as a witness. The defendant further failed to call as a witness his wife, who allegedly first saw the oncoming wrong-way truck. We observe that these alleged witnesses were evidently available for subpoena by both sides and that no negative presumption need apply. Shank-Jewella v. Diamond Gallery, 535 So.2d 1207, 1211 (La.App. 2d Cir.1988). However, the witnesses in fact did not testify, and the admissible evidence with regard to them does not affect the result reached which is based on other evidence and testimony.
From this record, we find that the trial court unreasonably assessed 100% of the fault for this accident to Reed. Martin's proceeding the wrong way in Reed's lane of travel set in motion the chain of events that lead to this accident. However, the vast majority of the fault of the accident must rest with Reed. The causal relationship between negligently swerving from the left lane into the right lane and striking Mrs. Barnes' vehicle is a direct one. The totality of the evidence indicates that Reed's car and Martin's truck were a substantial distance apart when both drivers began their evasive maneuvers. Mrs. Barnes did not see Martin's truck and Martin saw a truck at a significant distance *942 but never saw the sedans involved in the accident. Further, Martin had time to back up, pass through a near-by cross over to the east bound lanes of Washington and proceed on his way without noticing the collision. Reed evidently unnecessarily and negligently swerved into Mrs. Barnes' path instead of taking other available action, such as slowing or stopping, to avoid the Martin truck which by this time was backing away or already in the east bound lanes.
The court's decision not to apply the sudden emergency doctrine stands. Because the Martin vehicle and the Reed auto were substantial distances apart when Martin began correcting his error, Martin's truck was not in imminent danger of colliding with Reed's car. Therefore, Reed had no justification for deviating from his lane of travel into Mrs. Barnes' lane. See La. R.S. 32:79. In summary, we have determined that Reed should be assessed with 90% of the fault while Martin is cast with 10% of the fault, the lowest percentage which could reasonably have been attributed to him.

2. Damage Award
Defendants contest the trial court's decision to award the plaintiff $20,000.00 in general damages. General damages involve mental or physical pain and suffering, inconvenience, loss of intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured exactly in monetary terms. Sallis v. City of Bossier City, 28,483 (La.App.2d Cir.9/25/96), 680 So.2d 1333, writs denied, 96-2592, 96-2599 (La.12/13/96), 692 So.2d 376, 1063. The trial court has much discretion in the assessment of damages in tort cases. La. C.C. art. 2324.1. The discretion vested in the trier of fact is great, and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
Only after an articulated analysis of the facts discloses an abuse of discretion is examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. Dixon v. Tillman, 29,483 (La.App.2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact; likewise, to determine if an award is inadequate, the evidence must be viewed in the light most favorable to the defendant. Manuel v. State Farm Mut. Auto Co., 30,765 (La.App.2d Cir.8/19/98), 717 So.2d 277.
We find no abuse of the trial court's great discretion in this $20,000.00 award. Mrs. Barnes testified that she has suffered lower back pain almost continuously since the accident. The pain is of sufficient severity and frequency as to require Mrs. Barnes to take pain relief medication in order to sleep. The pain has partly limited Mrs. Barnes' ability to engage in business and personal activities that she once was able to conduct without difficulty. To no avail, Mrs. Barnes has seen several doctors in an effort to alleviate the pain, and she has undergone painful or frightening procedures that required hospitalization on one occasion. She has missed work in furtherance of unsuccessful efforts at physical therapy. The award *943 is sufficiently reasonable as not to require an examination of similar awards in similar cases.

DECREE
The trial court's judgment is amended to allocate 90% of the fault to defendant Jeremiah Reed and 10% to T.J. Martin. The award to plaintiff Judith Barnes of $20,000.00 in general damages is affirmed for the reasons given above. The payments to plaintiff pursuant to this judgment are to be reduced by 10%, the amount of fault attributed to T.J. Martin. Costs of this appeal are assessed to Jeremiah Reed and Allstate Insurance Company.
AFFIRMED.
STEWART, J., concurs.